ALTENBERND, Judge,
concurring and dissenting.
I concur with the majority’s well-reasoned opinion with one exception. I disagree with the majority’s decision that the evidence and the permissible inferences concerning the “actions on the part of Gerald Walsh” support the jury’s imposition of punitive damages against Local 1240. I would hold that the trial court should have directed a verdict on this punitive issue because the Rayburns did not plead, prove, or request jury instructions on a theory of vicarious punitive damages under Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla.1981), and did not prove a theory of direct punitive damages.
The evidence against Local 1240 is modest and circumstantial. Neither Gerald Walsh nor Martin Walsh testified in person at trial.[1] Martin Walsh was deposed while incarcerated for his criminal act. His deposition testimony, which was read to the jury, does not suggest that Gerald Walsh told him to burn the cranes, nor does it suggest that Gerald Walsh even knew of his intention to burn the cranes. Martin Walsh did not testify that he thought he was in the scope of his union activities when he burned the Rayburns’ cranes during the night. Despite the efforts of the police, including the use of a bugged informant, Martin Walsh never implicated Gerald Walsh or any other union official in his arson. The record contains no testimony from Edward DiBene.
Gerald Walsh was never deposed in this case. His sworn statement was given to the state attorney’s office in connection with the criminal case against Martin Walsh. That statement was indirectly presented to this jury through the testimony of two police officers who were present when the statement was given. Those officers also testified to statements which Ger-aid Walsh made at other times during their investigation.
There is no evidence that Local 1240 had any prior dealing with the Rayburns. There is no evidence that anyone on behalf of Local 1240 ever threatened the Ray-burns prior to this arson. t
In the light most favorable to the Ray-burns, the evidence is:
1) A week or ten days before this incident, Gerald Walsh and Martin Walsh attended a meeting in a restaurant with a representative of Allied Crane Services, a crane contractor which hired union operators. At this meeting, Martin Walsh threatened to burn any equipment that crossed the picket line. Gerald Walsh told the police that he did not reprimand Martin for this threat, but did constantly try to “tone him down” and keep Martin’s voice down because the restaurant was crowded.
2) Martin Walsh and Edward DiBene burned the cranes during the night at the home of Charles and Robbie Rayburn about fifteen to twenty miles away from the project.
3) Gerald Walsh told the police that Martin, Walsh informed him on the day following the arson that he had burned the cranes. Although Gerald Walsh claimed to be surprised by this action, he permitted Martin Walsh to continue to conduct union business.
4) Gerald Walsh made an anonymous telephone call to the police to report this crime. Although his cooperation with the police was sometimes reluctant, he did, in general, cooperate with the investigation. After the arson, Martin Walsh threatened Gerald Walsh with violence. Gerald Walsh told the police that he regretted putting Martin in the union position because he had “created a monster” that he could not control.
On this evidence, I agree that Local 1240 can be liable for compensatory damages. In addition to the instructions described in the majority opinion, the jury was instructed that Local 1240, although not liable for *1225 every act of a steward or business agent, would be liable for the destruction of the cranes if it occurred within the scope of either’s duties as steward or business agent. The jury was told that the scope of these duties was dependent on the act being the kind that the agent was appointed to perform; that the act must occur within the time and space limits of these duties; and that the act must have been activated at least in part by a purpose to serve Local 1240.
A jury could determine that Martin Walsh was acting within the applicable space and time limits in light of the broad nature of his duties. Likewise, a jury could decide that Martin burned the cranes in part to serve his union. The difficult question is whether arson is the type of act which he was appointed to perform.
Determining whether Local 1240 appointed Martin Walsh to perform this act is probably the same as determining whether Local 1240 authorized him to perform this act. From the above-described circumstantial evidence and its permissible inferences, a jury would be forced to speculate to determine that Local 1240, through Gerald Walsh, expressly authorized Martin Walsh to burn these cranes. Voelker v. Combined Ins. Co. of America, 73 So.2d 403 (Fla.1954).
Although the evidence does not permit a finding that Gerald Walsh had expressly authorized the burning of the Rayburns’ cranes, it does permit an inference that Martin Walsh reasonably believed that he was authorized to burn the equipment. From this evidence, the jury could have found that Martin Walsh reasonably believed that Gerald Walsh approved his threat to burn equipment, even though Gerald Walsh had no such intention and had misconstrued Martin Walsh’s serious threat for the huffing and puffing which frequently accompanies labor negotiations.
A principal, under limited circumstances, may be liable to a third person for the conduct of an agent when the principal unintentionally authorizes conduct which constitutes a tort. See generally, 3 Am. Jur.2d Agency § 75 (1986); Restatement (Second) of Agency § 215 (1958). The issue is not whether the principal intentionally authorizes the agent’s acts; rather, it is whether the agent reasonably believes that he or she is authorized to act based on the principal’s conduct. Although the evidence is thin, I believe that this jury could have found that Martin Walsh reasonably misinterpreted his superior’s inaction at the restaurant to be an authorization of his subsequent arson.
While this theory permits Local 1240 to be liable for compensatory damages, it is important to appreciate that it only involves negligent, accidental, or implied authorization by the union. Martin Walsh was, at best, a low-level member of this local union. His illegal conduct does not permit a theory of recovery for direct punitive damages against the union. Mercury Motors. The union can be directly liable for punitive damages only if Gerald Walsh or some other high-level union official was directly responsible for an act warranting punitive damages. Como Oil Co. v. O’Loughlin, 466 So.2d 1061 (Fla.1985); White Constr. Co. v. DuPont, 455 So.2d 1026 (Fla.1984). With all due respect to my colleagues, I cannot find evidence or inferences of such an act in this record.
The majority’s opinion emphasizes the fact that Gerald Walsh did not immediately call the police when Martin Walsh confessed his crime and that he continued, after the arson, to allow Martin Walsh to act for the local union. These facts may be relevant to the theory of ratification for compensatory damages, but I do not believe this specific conduct, after the completion of the agent’s tort, permits direct punitive damages. These post-arson actions did not cause or contribute in any fashion to Martin Walsh’s tortious act or to the injuries which were proximately related to the tor-tious act.
I do not believe that Winn-Dixie Stores, Inc. v. Robinson, 472 So.2d 722 (Fla.1985), requires this court to affirm in this case. In Winn-Dixie, the corporate defendant was held directly liable for punitive damages arising from conversion, false imprisonment, and malicious prosecution. It ap *1226 pears that the parties, including Winn-Dix-ie, assumed during the trial that the decisions necessary to detain and prosecute Mr. Robinson were made by corporate officials with sufficient authority to render the corporation directly liable. That was probably a reasonable assumption.[2] Certainly, a corporation can be directly liable for punitive damages if it commits an intentional tort through high-level management.
Unlike the defendant in Winn-Dixie, Local 1240 consistently maintained that it could not be directly liable for punitive damages unless the Rayburns established punitive conduct by the union’s management. The Rayburns chose not to pursue either a compensatory theory of negligence or a vicarious punitive damages theory. Thus, the Rayburns were required to prove direct punitive conduct by Local 1240. They failed to prove such conduct.

. It may be helpful for the reader to understand that Gerald Walsh and Martin Walsh are not related, nor does the evidence suggest that a close friendship existed between them.

. For a more detailed discussion of the facts, see the Fourth District’s opinion. Robinson v. Winn-Dixie Stores, Inc., 447 So.2d 1003 (Fla. 4th DCA 1984).